IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No. 1:19-cv-02965-SKC-JPO

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MONICA HARRINGTON, as the Personal Representative of the Estate of George Harrington,[1] and
MONICA HARRINGTON, individually,

      Defendants.

---

## ORDER ON
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. 74)

---

Plaintiff United States of America brought this lawsuit against George

Harrington to reduce to judgment civil FBAR[2] penalties for George's[3] alleged failure

---

[1] On January 25, 2023, Monica Harrington, George Harrington's wife, filed a Suggestion of Death informing the Court that George had died. Dkt. 97. The Government then filed a Motion to Substitute Monica Harrington as Representative of George Harrington, Dkt. 105, which the Court granted, ordering Monica Harrington, as personal representative of George Harrington's estate, be substituted as a party for George Harrington. Dkt. 107.

[2] As explained in more detail later, FBAR refers to the Report of Foreign Bank and Financial Accounts form, which is filed by United States persons and enforced by the Internal Revenue Service (IRS).

[3] For clarity, the Court will refer to the Defendants by their first names.

to timely report his interest in foreign financial accounts. *See generally,* Dkt. 1.[4] As will be explained in greater detail below, the Government may assess FBAR penalties when a United States citizen fails to file a Report of Foreign Bank and Financial Accounts (FBAR) identifying foreign financial accounts in which the citizen has an interest. *See, infra,* Section II. The requirement to file FBARs is meant to combat tax fraud by persons hiding foreign assets. *Id.* At issue here, though, is whether George was required to disclose certain of his and Monica Harrington's (George's wife) foreign financial accounts, and whether the failure to do so was willful.

In its First Amended Complaint (FAC) (Dkt. 50), the Government alleges that George willfully failed to file FBARs disclosing his interest in foreign financial accounts for 2007 through 2010 that held $1,864,451 in 2007 and had grown to $3,458,487 by 2010. *Id.* at ¶¶2, 22. The Government now seeks $1,729,244 in FBAR penalties from George, plus interest, additional penalties, and costs of collection (Count 1). *Id.* at ¶¶27-40. The Government also requests a determination that George fraudulently transferred the foreign funds at the center of this litigation to Monica (who was added as a Defendant in the FAC),[5] and that the transfer should be set aside (Count 2). *Id.* at ¶¶41-46. And lastly, the Government desires an order from this Court directing Monica to repatriate sufficient foreign funds to pay the FBAR

---

[4] The Court uses "Dkt. ___" to refer to docket entries in CM/ECF.

[5] The FAC added Monica as a Defendant to Counts 2 and 3.

penalties with interest, and to pay additional penalties and costs (Count 3) on behalf of George's estate. *Id.* at ¶¶47-49.

This matter is presently before the Court on the Government's Motion for Summary Judgment (Motion). *See* Dkt. 74. Monica, who is represented by counsel, filed her Response to the Motion (Dkt. 81), and the Government filed its Reply (Dkt. 91). George filed his Response *pro se*[6] (Dkt. 87), and the Government filed a Reply (Dkt. 93).[7]

This case was reassigned to the undersigned District Judge on January 19,

---

[6] George proceeded here *pro se* prior to his death; thus, the Court liberally construes his pleadings. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). But the Court does not act as his advocate. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

The Court also understands that George had counsel during the earlier stages of this case, prior to the Government filing its original complaint. *See* Dkt. 87, p.4. The Court further notes that George was represented by counsel in *Harrington v. Commissioner of Internal Revenue*, T.C. Memo 2021-95, 2021 WL 3140384 (July 26, 2021) (*Harrington I*), a case brought by George against the IRS seeking a redetermination of George's tax deficiencies from his underpayment of income taxes for 2005 through 2010 and for civil fraud penalties. George then appealed the *Harrington I* decision, but was no longer represented by the time the Tenth Circuit issued its opinion in *Harrington v. Commissioner of Internal Revenue*, No. 22-9000, 2022 WL 17333080 (10th Cir. Nov. 30, 2022) (*Harrington II*). *Harrington I* and *II* dealt with many of the same factual allegations as this case does.

[7] The Government later filed a Notice of Supplemental Authority advising the Court of *Harrington II*. Dkt. 96. George also filed a cross-motion for summary judgment. Dkt. 83. Monica clarified she did not join George's cross-motion. Dkt. 85. The Court struck George's cross-motion because he had filed it too late. Dkt. 95. The Court, however, told George it would consider his arguments in the cross-motion as a supplement to his response to the Government's Motion, which the Court has done. *Id.*

2024. Dkt. 108. The Court has carefully reviewed the Motion and associated briefing, and applicable law. The Court ORDERS the Motion be GRANTED IN PART AND TAKEN UNDER ADVISEMENT IN PART because the Court finds the undisputed material facts show that George willfully failed to file timely, accurate FBARs (Count 1), and he fraudulently transferred his interest in the funds to Monica (Count 2). But Count 3 requires additional briefing, and thus, the Court takes Count 3 under advisement for now.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994). "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)).

Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury, or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 248-49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132 (10th Cir. 2000). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is

4

"genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson,* 477 U.S. at 248.

## UNDISPUTED MATERIAL FACTS

The Court begins this story in 1984 when George became a logger in Washington state. Facts, ¶1.[8] In 1986, he began logging in Canada with Eastern Wood Harvesters (EWH). *Id.* at ¶¶2-3. Sometime in or near 1986, George sold his house and provided the proceeds, approximately $350,000, to EWH's attorney, John Glube.[9] *Id.* at ¶4.

In 2002, after George had stopped working with EWH, a lawyer in the Cayman Islands, John Wolf, contacted George. *Id.* at ¶6. Mr. Wolf told George that EWH was being wound down and it would be in George's interest to travel to the Cayman Islands. *Id.* Monica and George did so and met with Mr. Wolf. *Id.* at ¶7. George and Monica signed documents identifying themselves as powers of attorney for an account at UBS AG in Switzerland but that was titled to Reed International Ltd. (Reed), incorporated in the Cayman Islands. *Id.* at ¶¶9, 10. In addition, an account titled to

---

[8] The Court will refer to undisputed material facts as "Facts, ¶___." The citation is to the numbered paragraphs in the "Statement of Undisputed Material Facts" of Plaintiff's Motion. *See* Dkt. 74, pp.3-11. The Court, unless otherwise noted, will refer only to undisputed facts. *See* Dkt. 81, pp.1-5; Dkt. 87, pp.6-12.

[9] While George and Monica dispute whether George expected repayment of the funds provided to Glube, if he provided them for a specific purpose or with restrictions, or if he "gave" them to Glube, these disputes are not material to the Motion. *See* Dkt. 81, p.1, ¶4; Dkt. 87, p.6, ¶4.

Malta Ltd. (Malta), also incorporated in the Cayman Islands, was held at the Royal Bank of Canada. *Id.* at ¶¶12,13.

George travelled to Switzerland in late 2006 and early 2007 to meet multiple times with Catherine De Berti, an employee of UBS. *Id.* at ¶17. They discussed transferring funds then-held by Reed and Malta to a Lichtenstein entity known as a stiftung, which George agreed to do. *Id.* at ¶¶18, 19. Following this, George and Monica executed bylaws creating the Ruth Schröder Stiftung (Stiftung).[10] *Id.* at ¶20. George and Monica were the primary beneficiaries of the Stiftung. *Id.* at ¶21.

The Stiftung then opened an account at UBS in Switzerland with funds transferred from the Reed and Malta accounts. *Id.* at ¶22-25. The account opening documents directed that all correspondence be directed to Globaco AG in Switzerland. *Id.* at ¶28. George did not receive correspondence about the account nor did he request to be an authorized signatory for the account. *Id.* at ¶29. But he nevertheless believed the assets (or at least a portion of them) in the Stiftung's UBS account belonged to him. *Id.* at ¶27.[11]

---

[10] While Monica did not contest that the bylaws created a stiftung (which the Court understands can be an entity formed under the laws of Lichtenstein or Switzerland), Dkt. 81, p.2, ¶20, George did contest this fact, Dkt. 87, p.7, ¶20. But George later agreed with other facts that referred to the Ruth Schoder Stiftung as a stiftung. *See, e.g., id.* at p.8, ¶¶22, 24, 25.

[11] While George argues in his Response that he disputes this fact, he fails to cite any evidence in the record to place this fact in dispute. *See* Dkt. 87, p.8, ¶27. Rather, he implicitly acknowledges that his deposition testimony confessed this fact, but seeks now to distance himself from his prior testimony. *Id.* ("What he thought at the time

In 2009, UBS informed George and Monica that it was closing the Stiftung's UBS account because the account's beneficiaries (George and Monica) and their children were United States citizens. *Id.* at ¶31. George then returned to Switzerland to transfer the funds from the Stiftung's UBS account to life insurance policies with a Lichtenstein company called ValorLife. *Id.* at ¶32.

On December 20, 2009, George and Monica obtained two ValorLife insurance policies having a combined opening value of $3,102,629.80. *Id.* at ¶¶33, 36. The documents creating the policies identified George and Monica as the policyholders. *Id.* at ¶33. George directed ValorLife how to invest the policies, but he again did not request or receive statements from ValorLife after opening the accounts. *Id.* at ¶¶37, 38. Each of the accounts was an annuity that could be surrendered at any time for its present cash value.[12] *Id.* at ¶35.

In December 2012, George's and Monica's Swiss attorney cashed out the ValorLife insurance policies. *Id.* at ¶51. The cash proceeds from the ValorLife policies

---

of his deposition, years after the stiftung had been terminated should be irrelevant."). Moreover, no objection was made during his deposition to that portion upon which the Government relies. *See* Dkt. 74, Ex.1, 79:1-3. Further, Monica is "without sufficient information or belief to know George's belief whether the funds in the stiftung belonged to George . . . ." Dkt. 81, p.3, ¶27.

[12] While George disputed any facts beyond that the policies were deferred variable annuities, he cites nothing in the record that creates a genuine issue of disputed facts. *See* Dkt. 87, p.8, ¶35. (Monica, on the other hand, did not dispute these facts. *See* Dkt. 81, p.3, ¶35.) And again, no objections were lodged to the sections of George's deposition or Monica's deposition upon which the Government relies. *See* Dkt. 74, Ex.1, 87:8-10, 94:2-6; Dkt. 74, Ex.2, 26:11-18.

were then used to open an account at LGT Bank in Lichtenstein in Monica's name only with an opening balance of $2,789,230.92. *Id.* at ¶¶52-53.

In 2015, the LGT account was closed, and the funds were moved to an account at Vontobel Holding AG in Switzerland that was also solely in Monica's name. *Id.* at ¶57. George and Monica decided together to move the funds from LGT to Vontolbel. *Id.* at ¶58. As of July 31, 2022, this account had a balance of $2,898,930.

Since December 2012, George's only assets valued over $500 were household furniture, abandoned logging machinery, an abandoned sailboat, and a 1996 Toyota Camry.[13] *Id.* at ¶60. Monica paid most (or perhaps even all) of George's and her expenses. Dkt. 87, p.11, ¶61; Facts, ¶61; Dkt. 81, p.4, ¶61.

Meanwhile, in 2012, the IRS began reexamining George for tax years 2007 through 2010. Facts, ¶64. During the examination, George filed amended FBARs for 2008, 2009, and 2010, and for the first time filed an FBAR for 2007. *Id.* at ¶66. Monica and George also submitted amended federal income tax returns for 2007 through 2010. *Id.* at ¶68.

George acknowledged that he first learned of FBAR reporting requirements in the early 2000s.[14] *Id.* at ¶39. Prior to the IRS reexamination, George had timely filed

---

[13] George did not dispute these facts. Dkt. 87, p.11, ¶60. Monica disputes these facts only insofar as she claims that George also owned airplane parts and received Social Security income, which is not an asset. Dkt. 81, p.4, ¶60; *id.* at p.6, ¶¶6-7.

[14] George agreed with the Government's statement of undisputed material fact. Dkt. 87, p.9 ¶39. While Monica disputed this fact as "overly broad," she cites no

FBARs covering 2005, 2008, 2009, and 2010. *Id.* at ¶40. But these FBARs disclosed George's interest in accounts at Bank of New Zealand only; the FBARs did not report any interest in the Stiftung's UBS account or the ValorLife insurance policies. *Id.* at ¶¶42-43.

George prepared his and Monica's joint federal income tax returns for 2007 through 2010. *Id.* at ¶44. Each of those returns asked, "At any time during [the tax year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account or other financial account?" *Id.* at ¶45. Although George and Monica responded, "Yes," to that question, they left the location of the account(s) blank (except for the 2008 tax return, for which they identified "New Zealand"). *Id.* at ¶¶46-47. They did not identify the Stiftung's UBS account or the ValorLife insurance policies on those tax returns. *Id.* at ¶48. The jurat above the signature lines on the tax returns attested under penalty of perjury that the returns were accurate. *Id.* at 49.

The IRS assessed civil FBAR penalties against George for 2007 through 2010 on October 27, 2017. *Id.* at ¶70. The penalties were the result of the IRS's determination that George had willfully failed to report his financial interests in the Stiftung's UBS account and the ValorLife insurance policies, which George disputed (Dkt. 87, p.11, ¶69) and Monica disputed only as to the IRS's willfulness

---

evidence to contradict George's deposition testimony that he first learned in the early 2000s of FBARs and the requirement to file them. *See* Dkt. 81, p.3, ¶39.

determination. Dkt. 81, p.5, ¶69. The United States then filed this case to enforce the IRS's imposition of FBAR penalties.

Concurrently with the IRS's investigation and assessment of FBAR penalties, the IRS also determined that George had failed to report $791,661 in foreign investments for 2005 through 2010 and assessed civil fraud penalties. The IRS sought to enforce those penalties in *Harrington I*.[15] *See Harrington v. Comm'r of Internal Revenue*, 2021 WL 3140384, at *1-2 (T.C. 2021), *aff'd* 2022 WL 17333080 (10th Cir. Nov. 30, 2022). The *Harrington I* court found, among other things, the following:

- George had the control necessary over the Stiftung's UBS account and the ValorLife insurance policies to determine that he had underreported his income. *Id.* at *19. Indeed, the *Harrington I* court found that, to the extent that "there were restrictions on [George's] ability to make routine withdrawals, we find that he willingly divested himself of that power in order to conceal his offshore assets." *Id.* at *20.

- He argued the court should ignore his amended income tax returns, which the court rejected. *Id.* at *27.

---

[15] The Court takes judicial notice of other lawsuits and documents filed in those cases, including for the factual background of this case. *See Armstrong v. JPMorgan Chase Bank Nat'l Ass'n*, 633 F. App'x 909, 911 (10th Cir. 2015) (citation omitted) ("A court may consider facts subject to judicial notice–including facts that are a matter of public record, such as documents filed in other litigation . . . ."); *Tuttle v. Nationwide Affinity Ins. Co. of Am.*, No. 19-cv-00526-NYW, 2019 WL 2208513, at *2 (D. Colo. May 22, 2019) (a court may take judicial notice of other cases for the factual background of the case).

- He had given "implausible and inconsistent explanations about his income and assets." *Id.* at *33-34.

- He had knowingly concealed his assets "[a]s evidenced by his timely filing of FBARs reporting (very modest) balances in New Zealand banks, petitioner knew of his obligation to file FBARs reporting foreign financial accounts. But before the IRS audit he had never filed an FBAR disclosing any of his holdings in the Cayman Islands, Switzerland, or Leichtenstein." *Id.* at *36.

- He made false statements about his supposed lack of control over the accounts. *Id.* at *38-39 (George "plainly had (and knew that he had) control over the offshore accounts, as evidenced (among other things) by his repeated directions that funds be rolled over from one investment vehicle to the next.").

When George appealed *Harrington I* to the Tenth Circuit, that court upheld the lower court. *Harrington v. Comm'r of Internal Revenue*, 2022 WL 17333080, at *1 (10th Cir. Nov. 30, 2022) (*Harrington II*).

## ANALYSIS

### I. Standing of Monica to Argue Against George's FBAR Liability

As a predicate matter, the Government argues that Monica has no prudential standing to argue against George's liability for FBAR penalties, *i.e.*, Count 1. Dkt. 91, pp.5-6. Because the Government raised its prudential standing argument in its

11

Reply, the Court does not have the benefit of Monica's perspective on her standing vis-á-vis George's alleged FBAR liabilities. Nonetheless, on the record currently before the Court, the Court finds that Monica does have standing to argue that George is not liable for alleged FBAR violations.

"[T]he Supreme Court's standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, . . . and prudential standing which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *United States v. Wilson*, 445 F. App'x 141, 144 (10th Cir. 2011) (quoting *Wilderness Socy' v. Kane Cnty.*, 632 F.3d 1162, 1168 (10th Cir. 2011) (cleaned up). Article III standing requires a litigant to have suffered an "injury in fact." *Id.* (citing *Wilderness Soc'y*, 632 F.3d at 1168). Prudential standing sets forth several limits on courts, including "the general prohibition on a litigant's raising another person's legal rights." *Id.* (citing *Wilderness Soc'y*, 632 F.3d at 1168). "The [litigant] generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* (citing *Wilderness Soc'y*, 632 F.3d at 1168). "Without such limitations—closely related to [Article] III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Id.* (citing *Wilderness Soc'y*, 632 F.3d at 1168-69).

Importantly, the Supreme Court has further explained, "[a]lthough parties generally may not challenge the tax liabilities of others, this rule is not unyielding." *United States v. Williams*, 514 U.S. 527, 539 (1995). In elucidating examples of when the rule is more flexible, the Supreme Court noted, "certain transferees may litigate the tax liabilities of the transferor; if the transfer qualifies as a fraudulent conveyance under state law, the Code treats the transferee as the taxpayer . . . ." *Id.* (citations omitted).

According to the FAC, the Supreme Court's example is precisely the situation at issue here. Count 2 of the Complaint alleges George fraudulently transferred the $2.7 million from the ValorLife policies to a bank account held solely in the name of Monica to "hinder, delay, or defraud his creditors, including the United States." Dkt. 50, ¶¶41-45. The FAC asks that the transfer be set aside pursuant to 28 U.S.C. § 3304. *Id.* at ¶46.

The Government cites *Wilson* and *United States v. Mantarro*, No. 88CV871, 1992 WL 551483 (N.D. Ohio June 19, 1992), to support its position that Monica lacks standing. But *Mantarro* was decided three years prior to *Williams, supra*. And the specific outcome of *Wilson* is inapposite. There, the Government sought to enforce its tax lien against property that Wilson claimed he had not owned for years. *Wilson*, 445 F. App'x at 145. The *Wilson* court held that Wilson did not have prudential standing to argue against the Government foreclosing on property that Wilson claimed he no longer owned. *Id.* Quoting *Maisano v. Welcher*, 940 F.2d 499, 501 (9th

Cir. 1991), the *Wilson* court illustrated, "If the [truck] belongs to the trust, the [taxpayers] have no standing to sue and their case must be dismissed. If the [truck] actually belongs to the [taxpayers], they lose their argument that the IRS seized property belonging to the wrong party[.]"

Here, the Government is in a similar predicament: if the Court accepts its argument that George fraudulently transferred the assets to Monica, then Monica has standing to argue George's non-liability for FBAR penalties; if the Court rejects the Government's argument that the transfer was fraudulent, then the Government may be correct that Monica lacks prudential standing to argue against George's alleged FBAR liabilities, but then the Government may not be able to recover any FBAR penalties from the subject funds. Thus, recognizing the Court lacks the benefit of Monica's response to the Government's standing argument, the Court finds that Monica has standing to argue against George's alleged FBAR filing penalties based on the Government's claim of fraudulent transfer and the Court's ruling on that claim, analyzed below.

## II.    Count 1 – Liability for FBAR Penalties

### a.    Standard of Review of FBAR Penalty Assessment

The Court reviews the Government's finding of willful FBAR filing violations *de novo*. *United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012). But the Court reviews the Government's determination of the amount of FBAR penalties assessed under the arbitrary and capricious standard. *United States v. Rum*, 995 F.3d

882, 892-93 (11th Cir. 2021). Monica concedes these standards of review while George is silent. *See* Dkt. 81, p.12; Dkt. 87.

### b.   Liability

The Government must prove the following elements to establish George is liable for willful FBAR penalties: (1) George is a United States citizen; (2) George had an interest in, or signatory or other authority over, a foreign bank, securities, or other accounts; (3) the balance of the accounts exceeded $10,000; (4) George failed to file FBARs disclosing the accounts; and (5) such failure was willful. *See McBride*, 908 F. Supp. 2d at 1201.

It is undisputed that George is a United States citizen, satisfying the first element. The crux of the issue on summary judgment is whether George had an interest in an account for which he was required to file FBARs and, if so, whether his failure to file FBARs was willful. As explained below, the Court holds that George did have such an interest in, or signatory or other authority over, the Stiftung's UBS account and the ValorLife insurance policies, and he willfully failed to file FBARs disclosing his interest(s) or control over them.

### i.   An Interest in, or Signatory or Other Authority Over, a Foreign Bank, Securities, or Other Account

Despite George's argument that he did not have an interest in foreign accounts subject to FBAR reporting (Dkt. 87, pp4-6), he has already acknowledged he had an interest in foreign accounts for which FBAR reporting was required. Thus, this

element (the second element) is satisfied.

During the years relevant here, FBARs were required of "[e]ach person subject to the jurisdiction of the United States (except a foreign subsidiary of a U.S. person) having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country . . . ." 31 C.F.R. § 103.24 (2006). The regulations were revised effective June 24, 2011, after the relevant reporting years for this case. *See* 31 C.F.R. § 1010.350 (2011). But the regulatory revisions clarified the types of accounts for which people were already required to file FBARs. *See Notice of Propose Rulemaking—Amendment to the Bank Secrecy Act Regulations—Reports of Foreign Financial Accounts*, 75 FR 8844-01, 2010 WL 667290, at 8846 (Feb. 26, 2010) ("While FinCEN understands that the term 'other financial account' is broad enough to cover a range of relationships with foreign financial agencies, FinCEN believes that compliance will be enhanced by more clearly delineating the types of relationships that must be reported."); *see also Final Rule—Amendment to the Bank Secrecy Act Regulations—Reports of Foreign Financial Accounts*, 76 FR 10234-01, 2011 WL 645003, at 10239 (Feb. 24, 2011) ("The term 'other financial account' appears in current section 103.24. In order to enhance compliance, the NPRM proposed certain types of accounts that would fall within the meaning of this term.").

George relies on the later version of the regulations to argue that the Stiftung's UBS account was not an "other financial account." Dkt. 87, p.4 (incorrectly citing 31 C.F.R. § 103.24(e)(2)(iv), but apparently intending to cite to 31 C.F.R.

§ 1010.350(e)(2)(iv), the revision of the regulation that became effective June 24, 2011, that includes the language upon which George relies). George's argument is not persuasive.

Monica's Response similarly focuses on the 2011 regulation revisions to suggest the 2011 changes, which she characterizes as defining more expansively "other financial account," mean that George was not required to file FBARs for the Stiftung's UBS account or ValorLife policies during the relevant years. Dkt. 81, pp.13-16. But as already explained, the regulatory revision intended only to clarify the types of accounts for which FBARS were required; it neither expanded nor excluded specific accounts.

But these arguments are largely academic based on the undisputed material facts. After the IRS began investigating Defendants' tax returns, George submitted signed, revised income tax returns for 2007 through 2010 that disclosed the Stiftung's UBS account and the ValorLife policies. Facts, ¶68; *see also Harrington I*, 2021 WL 3140384, at *12. And importantly, George also submitted FBARs disclosing those same accounts for the first time. Facts, ¶66; *see also Harrington I*, 2021 WL 3140384, at *12. George now seeks to do an about face and instead rely only on his original income tax returns that he filed without FBARS disclosing the Stiftung's UBS account and ValorLife policies, and ignore his amended or revised tax filings which disclosed these foreign accounts through FBARs. *See* Dkt. 87, p.4. But a signed tax return is an admission. *Harrington II*, 2022 WL 17333080, at *2 ("[i]t has been held

repeatedly that positions taken in a tax return signed by a taxpayer may be treated as admissions." *Mendes v. Comm'r*, 121 T.C. 308, 312 (2003)). And with the revised FBARs, George also submitted revised income tax returns disclosing the income received from the Stiftung's UBS account and the ValorLife policies and the countries in which they were held. Dkt. 74-35, 74-36, 74-37, 74-38.

The Court finds that George's submission of revised tax returns and FBARs is determinative of whether he had an interest in foreign accounts subject to FBAR reporting. George confessed the point with the filing of his amended or revised tax returns and the FBARs for the subject accounts.[16] The Court further finds that George had control or authority over the Stiftung's UBS account[17] and ValorLife

---

[16] The Court notes that George was represented by counsel at the time he filed the revised income tax returns and FBARs. *See* Dkt. 87, p.4. Moreover, George has already attempted to distance himself from the revised income tax returns and FBARs, and both the Tax Court and the Tenth Circuit have rebuffed him. *Harrington I*, 2021 WL 3140384, at *10 ("During the examination [George] submitted amended joint returns for 2005-2010. * * * [George] thus has conceded that he underpaid his tax for those five years." (citing *Badaracco v. Comm'r*, 464 U.S. 386, 399 (1984))); *Harrington II*, 2022 WL 17333080, at *2 (George arguing that he submitted the amended tax returns mistakenly, but the Tenth Circuit declining to reweigh evidence). Indeed, the Tax Court found, and the Tenth Circuit upheld, that George committed fraud in underreporting his income for 2005 through 2009, and rejected George's arguments that he now resurrects with this Court. *See Harrington I*, 2021 WL 3140384, at *11; *Harrington II*, 2022 WL 17333080, at *2-3.

[17] The Court does not find that all stiftungs are financial accounts subject to FBAR reporting, as intimated by the Government. *See* Dkt. 93, p.6. The Court need not make such a finding here. And while other courts have found that some stiftungs are foreign trusts for which FBARs must be filed, those courts have engaged in fact-specific analysis of federal trust law. *See, e.g., Rost v. United States*, No. 1:19-CV-0607-RP, 2021 WL 5190875, at *4 (W.D. Tex. Sept. 22, 2021). As the *Rost* court noted,

policies, these are foreign accounts, and the balance of each account exceeds $10,000.

### ii. Whether Such Failure Was Willful

The Court further finds that George's failure to file timely and accurate FBARS concerning the Stiftung's UNS account and ValorLife policies was willful. George and Monica each attempt to incorporate a subjective element to willfulness in the FBAR context. *See* Dkt. 81, p.16; Dkt. 81-1, ¶6. But neither offers any legal support for their interpretation. The Court rejects their effort. *See Norman v. United States*, 942 F.3d 1111, 1115 (Fed. Cir. 2019) (rejecting similar argument).

Instead, and because the Tenth Circuit has yet to rule on the subject, the Court is persuaded by the holdings of the Third, Fourth, Eleventh, and Federal Circuits that willfulness in the context of failing to file FBARs includes not only knowing failures to file but also reckless failures. *Bedrosian v. United States*, 912 F.3d 144, 152 (3d Cir. 2018); *United States v. Rum*, 995 F.3d 882, 889 (11th Cir. 2021) (finding that every court of appeal that has addressed whether willfulness included recklessness in FBAR context found that it did); *United States v. Worowitz*, 978 F.3d 80, 89 (4th Cir. 2020) (willfulness includes recklessness); *Norman*, 942 F.3d at 1115 (same).

---

"The category of vehicle under which a financial entity is organized, whether *Stiftung* or something else, is unimportant for tax purposes." *Id.* The important point is the function of the entity. *See id.* The Court here, however, need not undergo this analysis based on George's admission that the Stiftung's UBS account was subject to FBAR requirements.

"[A] person commits a reckless violation of the FBAR statute by engaging in conduct that violates 'an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Bedrosian*, 912 F.3d at 153 (quoting *Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 68 (2007) (further quoted citation omitted)); *Rum*, 995 F.3d at 890 (same). "With respect to IRS filings in particular, a person 'recklessly' fails to comply with an IRS filing requirement when he or she '(1) clearly ought to have known that (2) there was a grave risk that [the filing requirement was not being met] and if (3) he [or she] was in a position to find out for certain very easily.'" *Bedrosian*, 912 F.3d at 153 (quoting *United States v. Carrigan*, 31 F.3d 130, 134 (3d Cir. 1994) (further quoted citation omitted)).

Applying this standard, the undisputed material facts show that George's failure to file FBARs was willful. George first learned of FBAR reporting requirements in the early 2000s. Facts, ¶39. He timely filed FBARs for 2005, 2008, 2009, and 2010 that disclosed his interest in his accounts at Bank of New Zealand only, and not the Stiftung's UBS account or the ValorLife policies. *Id.* at ¶40-43. But, based on his past filings, George was clearly aware of FBARs and that they required disclosure of foreign accounts over which he had an interest or other authority and where the balance of the accounts exceeded $10,000.

Additionally, George utilized several foreign bankers and attorneys to manage his financial affairs and foreign investments. *See, e.g., id.* at ¶¶17, 18, 32, 33, 51. Despite his substantial foreign investments, his knowledge of FBAR filing

requirements, and his surrounding himself with foreign bankers and attorneys to assist with his foreign financial investments, George waited until 2012, when the IRS began reexamining his tax filings for tax years 2007 through 2010, before he *finally* filed an FBAR for 2007 and amended his federal income tax returns and other FBARs for 2007 through 2010 to disclose his interest in (or authority over) the Stiftung's UBS account and ValorLife policies.

Further evincing his willfulness, while George believed the Stiftung's UBS account contained money belonging to him (Facts, ¶27), he declined to receive correspondence from UBS concerning the account. *Id.* at ¶29. Similarly, he directed how the ValorLife policies were to be invested (*id.* at ¶37), yet he again did not request to receive account statements. *Id.* at ¶38. This Court agrees with the *Harrington I* court that George was actively attempting to conceal these accounts from the American authorities through his willful blindness. *See Harrington I*, 2021 WL 3140384, at *34-37.

To be sure, George prepared the Harrington's original income tax returns. Facts, ¶44. Each tax return asked the Harringtons if they had an interest in or signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account. *Id.* at ¶45. While the Harringtons responded "yes," they only identified their New Zealand accounts. *Id.* at ¶¶46, 47. These are the same tax returns that the court in *Harrington I* found were evidence of George's tax fraud. *Harrington I*, 2021 WL 3140384, at *30. And given his

experience with, and access to, attorneys and bankers, and his experience in business, foreign financial investments, and filing of tax returns and FBARs, the Court finds that George should have known there was a grave risk that he was failing to meet the FBAR requirement for the Stiftung's UBS account and ValorLife policies, and he was in a position to easily verify those requirements had he chosen to do so. *See Bedrosian*, 912 F.3d at 153; *see also United States v. Collins*, 36 F.4th 487, 492 (3d Cir. 2022) (sophisticated taxpayer who intentionally managed accounts to avoid receiving mail from foreign account willfully failed to file FBARs).

Consequently, the Court finds that George willfully failed to file FBARs disclosing the Stiftung's UBS account and the ValorLife policies for the years 2007 through 2010.

### iii. Remaining Elements of FBAR Violations Are Met

The remaining elements of a willful failure to file FBARs are readily met. George was a United States citizen from birth. Dkt. 74, Ex.1, 10:20-21. The balances or value of the accounts in question exceeded $10,000 for each year in question. *See* Dkt. 74, Exs.31-34. And George plainly failed to file timely, accurate FBARs that disclosed the Stiftung's UBS account and the ValorLife policies. *See* Dkt. 74, Exs.31-34.

### c. Penalty Amount

The Court further finds the Government's FBAR penalties assessed against George are not arbitrary and capricious. *Rum*, 995 F.3d at 892-93. The maximum

amount of an FBAR penalty for the willful failure to file an FBAR is the greater of $100,000 or 50% of the balance of the account at the time of the failure to file. 31 U.S.C. § 5321(a)(5)(C).

Here, the Government assessed the following amounts for the years in question.

| Year | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Amount in Accounts per Revised FBAR | $1,864,451 | $3,249,734 | $3,384,645 | $3,458,487 |
| Proposed Penalty Amount | $269,633 | $469,970 | $489,481 | $500,160 |
| Proposed Penalty as a Percentage of Account Value | 14.5% | 14.5% | 14.5% | 14.5% |

The total amount of FBAR penalties the Government seeks is $1,729,244.

The Court notes that the Government "does not seek to hold Monica liable for the FBAR penalties against her husband. Nor does it seek to garnish her separate property to pay a judgment against him. Rather, the United States seeks a determination that the funds in a bank account solely in Monica's name belong equally to George." Dkt. 91, p.5. But even assuming (without deciding) that George only owned 50% of the foreign accounts at the time he failed to submit FBARS, the proposed penalties would amount to 29% of George's (assumed) half of the account

balances. Given the fact that the Government could have assessed penalties for each FBAR violation up to 50% of the undeclared account balances, the Court finds that the proposed penalties are not arbitrary and capricious, regardless of whether George owned 50% or 100% of the accounts.

Thus, the Government is entitled to summary judgment on Count 1.

### III.   Count 2 – Alleged Fraudulent Transfer of ValorLife Funds to Monica

The Government characterizes George's transfer of the funds from the liquidation of the ValorLife policies—which were originally titled in both George's and Monica's names, but then titled solely in Monica's name when the transfer was made—as a fraudulent transfer. Dkt. 50, ¶¶41-46. Monica disputes the Government's claim, while George is silent. Dkt. 81, pp.18-25; *see generally*, Dkt. 91. Here, the Court finds the Government is entitled to summary judgment on Count 2.

The Federal Debt Collections Procedures Act provides, "a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation . . . with actual intent to hinder, delay, or defraud." 28 U.S.C. § 3304(b)(1). The Act further provides that fraudulent transfers can be voided, and provides limitations on when and how such a transfer can be voided. *Id.* at §§ 3306(b)(1), 3307.

To determine when actual intent to hinder, delay, or defraud exists, the Act

24

sets forth 11 non-exclusive badges of fraud for courts to consider. *Id.* at § 3304(b)(2).

The badges are "whether—

> (A) the transfer or obligation was to an insider;
>
> (B) the debtor retained possession or control of the property transferred after the transfer;
>
> (C) the transfer or obligation was disclosed or concealed;
>
> (D) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (E) the transfer was of substantially all of the debtor's assets;
>
> (F) the debtor absconded;
>
> (G) the debtor removed or concealed assets;
>
> (H) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (I) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (J) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

*Id.*

"Because proof of actual intent to hinder, delay or defraud may rarely be established by direct evidence, courts infer fraudulent intent from the circumstances surrounding the transfer." *United States v. Key*, 837 F. App'x 348, 354 (6th Cir. 2020)

(quoting *Schilling v. Heavrin (In re Triple S Rest., Inc.)*, 422 F.3d 405, 416 (6th Cir. 2005)). "[A]lthough badges of fraud are not conclusive, 'a concurrence of several badges will always make out a strong case.'" *Id.* at 353 (quoting *United States v. Osborne*, 807 F. App'x 511, 524 (6th Cir. 2020)).

Having considered the 11 badges of fraud, the Court finds six of them exist concerning the transfer from George to Monica of George's portion of the ValorLife policy proceeds.[18] Monica concedes she is an insider and that George transferred substantially all of his assets to her, satisfying two badges of fraud. Dkt. 81, pp.21, 24. Further, the Court finds that George concealed the transfer of funds from the jointly-owned ValorLife policies to the Monica-owned LGT account. When the Court granted the Government's motion to amend the complaint, the Court already held George "attempted to avoid revealing that information [about the transfer] despite at least one interrogatory question . . . which should have elicited that information by way of a full and truthful response." Dkt. 49, p.4. The Court further found, George "attempted to dissemble and/or obfuscate in such a manner that his wife's role would not become apparent." *Id.* at pp.4-5. Thus, a third badge of fraud exists.

Moreover, until the IRS initiated the audits of the Harringtons, George had concealed the existence of the Stiftung's UBS account and ValorLife policies. While Monica argues that the funds were reported on income tax returns and FBARs, it is

---

[18] See Section IV, *infra*, concerning what exactly George's portion may have been.

more accurate to say that they were reported on *revised* income tax returns and FBARs that were precipitated by the IRS audits. *See Harrington I*, 2021 WL 3140384, at *12. Indeed, the *Harrington I* court found that George fraudulently concealed these assets from 2005 through 2010. *Id.* at *36. The Court therefore finds a fourth badge of fraud exists.

The timing of the transfer demonstrates a fifth badge of fraud. The Government sent the IRS Notice of Audit or Examination to an address that was, in fact, a mail forwarding service, which only forwarded mail to the Harringtons upon request. Dkt. 87, p.10, ¶50; Dkt. 81, pp.10-11, ¶¶30, 31, 33. Monica admits that on January 23, 2013, George requested their mail be forwarded to the Harringtons from their mail holding service, and George and the Harrington's tax attorney had George's first interview with the IRS on January 30, 2013. Dkt. 81, p.23. The LGT account was opened solely in Monica's name the next day, on January 31, 2013, after George was plainly aware of the IRS audit. Facts at ¶53; Dkt. 74-1, 103:4-9; Dkt. 74-21.

The Court additionally finds that George transferred the ValorLife funds to Monica in exchange for no economic value, thus satisfying a sixth badge of fraud. Monica suggests she provided George with love and devotion during their marriage and with estate planning means in exchange for his interest in the ValorLife funds. Dkt. 81, p.24. But the Court agrees with the Government: "[l]ove and affection or emotional benefit would not help [Monica's] case here." *See United States v.*

27

*Schippers*, 982 F. Supp. 2d 948, 969 (S.D. Iowa 2013) (citing *United States v. Moore*, 156 F. Supp. 2d 238, 246 n.2 (D. Conn. 2001) ("Any intangible, emotional benefit is not included within the meaning of reasonable equivalent value because within the meaning of the statute, value means economic value." (cleaned up)).

Monica also suggests she advanced monies to George back in the late 1990's and intimates that George's transfer of his interest in the ValorLife policies was somehow connected to the 1990's advances. Dkt. 81, pp.6, 24. The relevant badge of fraud described by 28 U.S.C. § 3304(b)(2)(H) says, "the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . . ." The Court finds these events to be too temporally disconnected to have any bearing on George's transfer of his ValorLife interest in January 2013. *See Key*, 837 F. App'x at 353 ("In determining whether the transferor received 'reasonably equivalent value,' the 'critical time is when the transfer is made.'" (quoting citation omitted)); *Anderson,* 477 U.S. at 248 (factual dispute is "genuine" only if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party).

The Government further argues that the transfer occurred shortly after George incurred a substantial debt, namely the FBAR penalties for failing to file timely, accurate FBARs. *See* Dkt. 74, pp.24-25; Dkt. 91, p.9 (citing *United States v. Park*, 389 F. Supp. 3d 561, 574-75 (N.D. Ill. 2019). Monica argues that this badge is not met because, according to her, the debt did not arise until the IRS assessed the FBAR

28

penalties. Dkt. 81, p.25. The Court agrees. The most recent FBAR report required was the 2010 FBAR, which was not due until June 2011. Yet, the transfer to Monica did not occur until January 31, 2013, approximately 19 months later. The Government did not direct the Court to any authority to help the Court understand temporally what is meant by "*shortly* before or *shortly* after a substantial debt was incurred." *See* 28 U.S.C. § 3304(b)(2)(H) (emphasis added). Thus, the Court finds that this badge of fraud is not present.

Similarly, although the Government argues the transfer resulted in George becoming insolvent (another badge of fraud), the Court is not convinced on the present record. "[A] debtor is insolvent if the sum of the debtor's debts is greater than all the debtor's assets at a fair valuation." 28 U.S.C. §3302(a). "A debtor who is generally not paying debts as they become due is presumed to be insolvent." *Id.* at § 3302(b). Monica notes that George still had some assets (aircraft and logging equipment) and received Social Security income. Dkt. 81, pp.24-25. While the transfer appears to be of substantially all of George's assets, there appear to be disputed issues of material fact concerning this badge of fraud.

While the Government raised the previous eight badges of fraud, Monica also addressed the remaining three. Because the Government does not appear to contest Monica's arguments, the Court finds no disputed issues of material fact regarding whether the debtor retained possession or control of the property transferred after the transfer occurred—he did not. Further, it is undisputed George did not abscond.

And regarding the last badge of fraud—whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor—the Court finds this badge of fraud inapposite.

The Court finds six (out of 11) badges of fraud are present. *See Key*, 837 F. App'x at 354 (five badges of fraud sufficient to uphold summary judgment for government); *Osborne*, 807 F. App'x at 524 (six badges of fraud sufficient to affirm summary judgment). As a result, the Court finds a reasonable jury could only determine that George's transfer of his interest in the ValorLife policies to Monica was a fraudulent transfer under 28 U.S.C. § 3304. *See Anderson,* 477 U.S. at 248. The Motion is granted, therefore, as to Count 2.[19]

## IV.   Count 3 – Whether to Order Monica to Repatriate Sufficient Funds to Satisfy George's FBAR Liability

Count 3 is problematic. The Government seeks an order commanding Monica to repatriate sufficient funds to satisfy the FBAR penalties, including interest, late penalties, and costs. To that end, the Government contends that "[i]n no event . . . is any portion of the $2.7 million Monica's separate property, as she claims." Dkt. 91, p.7. In support of this argument, the Government cites 28 U.S.C. § 3010(a) for the proposition that "[s]tate law determines whether co-owned property can satisfy George's liability," and then alleges how Washington state law controls because the

---

[19] The Court notes that George did not address the badges of fraud at all. *See* Dkt. 87.

Harringtons were Washington residents when they obtained the ValorLife policies.[20] *Id.*

But Section 3010(a) reads, "The remedies available to the United States under this chapter may be enforced against property which is co-owned by a debtor and any other person *only to the extent allowed by the law of the State <u>where the property is located</u>.*" (emphasis added). Because the subject funds (*i.e.*, the property) are held and located in a foreign country, it strikes the Court that Section 3010 requires examining the laws of Switzerland (or potentially, Lichtenstein) to determine whether the Government can seek recovery of George's FBAR penalty liability from the Vontobel account. The Court recognizes that Section 3010 discusses the determination of property rights in context of the "State" in which the property is located, and that Section 3002 defines "State" to mean "any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Marianas, or any territory or possession of the United States." While the statute is silent concerning foreign-held property, the Court believes that looking to foreign laws to define ownership interests in foreign property is most analogous to looking to state laws to define ownership interest. This would seem especially true where, as

---

[20] The Government apparently concedes that Monica has *some* ownership interest in at least a portion of the funds that the Government now seeks to have the Court declare fraudulently transferred. *See* Dkt. 91, p.7 ("If the transfer was fraudulent, then the entire $2.7 million remains community property.").

here, the subject property is not located in any "State" because it is held overseas.

But the parties do not address this issue in their briefing. Nor do the parties discuss this Court's authority (or lack thereof) to order a United States citizen to repatriate funds held in a foreign country. Because the parties fail to discuss these issues—*i.e.*, whose law applies under 28 U.S.C. § 3010(a) when the property is located in no "State" because it is located in a foreign country and what the Court's authority to order repatriation of foreign funds may be—the Court cannot determine what portion of the account at issue is George's fraudulently transferred funds or what portion the Court should order Monica to repatriate (50%, 100%, or some other amount), if anything. *See, e.g., United States v. Silverman*, No. 18-cr-00407-PAB, 2019 WL 6799460, at *14 (D. Colo. Dec. 13, 2019) (holding that, based upon Colorado law, only half of a joint account was subject to garnishment).[21]

*   *   *

For the reasons shared above, the Motion for Summary Judgment is GRANTED IN PART and TAKEN UNDER ADVISEMENT IN PART. It is GRANTED as to Counts 1 and 2 and judgment shall enter in favor of the Government, and against Defendants (as applicable) on Counts 1 and 2. It is TAKEN UNDER ADVISEMENT as to Count 3.

It is ORDERED that the Parties shall file simultaneous briefs **on or before**

---

[21] The Court also notes that the Government is silent about whether it has tried to attach any of George's other assets.

**March 20, 2024**, not exceeding 10 pages in length, on the issues of whose law applies under 28 U.S.C. § 3010(a) when the property is located in no "State" because it is located in a foreign country and this Court's authority (or lack thereof) to order a United States citizen to repatriate funds held in a foreign country. No response briefs are permitted, absent leave of the Court. Oral argument may be necessary after the Court's review of the briefs.

DATED: February 28, 2024.

BY THE COURT:

S. Kato Crews
United States District Judge